BRETT L. TOLMAN, United States Attorney (#8821)
J. DREW YEATES, Assistant United States Attorney (#9811)
Attorneys for the United States of America
185 South State Street, Ste. 300 • Salt Lake City, Utah 84111
Telephone:  (801) 524-5682 • Facsimile:  (801) 524-6924
Email:  drew.yeates@usdoj.gov

_____

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION
_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:09CR83 TS |
| Plaintiff, | : | **UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT** |
| vs. | : | |
| MICHAEL RICHARD BAY, | : | |
| Defendant. | : | Judge Ted Stewart |

_____

The United States of America, by and through the undersigned Assistant United States Attorney, hereby submits this Memorandum in Opposition to Defendant's Motion to Dismiss Indictment. The Court should deny the defendant's motion because the his spouse's Second Amendment right to have a firearm trumps his restricted status as a violent felon.

## FACTS

The United States disputes the facts presented by Defendant in the memorandum in support of his motion. On January 22, 2009, law enforcement officers were summoned to the home of the defendant Michael Bay ("Defendant") and his spouse Jennifer Bay ("Mrs.

Bay) in Eagle Mountain, Utah, due to a property dispute between Defendant and Mrs. Bay. Deputy Taylor and Sergeant Cornell from the Utah County Sheriff's Office responded to the residence in an effort to keep the peace.

Mrs. Bay told law enforcement that she had two guns stored at Defendant's family's cabin and asked how she could get them back. Defendant, overhearing the conversation, voluntarily stated that there was only one firearm and that he had it with him at the home after having brought it down from the cabin the night before. Sergeant Cornell asked Defendant where the gun was located and Defendant pointed to a shed on the side of the house. Sergeant Cornell and Defendant walked to the shed where Defendant pointed inside the shed and stated that the gun was on the floor in a green bag. Sergeant Cornell retrieved the gun. Soon thereafter law enforcement learned that Defendant had been convicted of two counts of felony child abuse.

## ARGUMENT

I.   **The *Heller* decision does not cast doubt on the longstanding prohibition on possession of firearms by convicted felons.**

In *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008), the Supreme Court held that the Second Amendment provides an individual with a right to possess a firearm for lawful purposes, such as self-defense within the home. In so doing, the Court held unconstitutional two District of Columbia statutes to the extent that they totally banned handgun possession in the home and required all firearms within homes to be kept inoperable at all times, and thus unavailable for the lawful purpose of self-defense. At the

same time, however, the Supreme Court made clear that "the right secured by the Second Amendment is not unlimited." *Id.* at 2816. The Court emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." *Id.* at 2816-17. The Court intended its identification of such "presumptively lawful regulatory measures only as examples," not as an exhaustive list. *Id.* at 2817 n.26. The Supreme Court in *Heller* indicated that its holding addressed only "lawabiding, responsible citizens." *Id*. at 2821.

Given these admonitions, *Heller* cannot be read to disturb the settled historical understanding that a person may forfeit his right to keep and bear arms by committing serious crimes or by otherwise demonstrating a lack of self-control. At the time of the Founding, even those who strongly supported a specific constitutional amendment guaranteeing an individual right to keep and bear arms recognized that violent criminals would not enjoy such a right. One proposed amendment, presented at the Pennsylvania ratifying convention in 1787, would have provided:

> That the people have a right to bear arms for the defence of themselves and their own State or the United States, * * * and no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals[.]

2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 665 (1971) (emphasis added). Likewise, the Massachusetts ratifying convention in 1788 proposed an amendment providing "that the said Constitution be never construed to

authorize Congress * * * to prevent the people of the United States, who are *peaceable citizens*, from keeping their own arms." *Id*. at 681 (emphasis added).

These proposed amendments echoed the common-law understanding that the right to keep and bear arms simply did not extend to violent criminals or to other individuals whose possession would pose obvious safety risks. *See, e.g.*, Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 OKLA. L. REV. 65, 96 (1983) ("Colonial and English societies of the eighteenth century * * * excluded infants, idiots, lunatics, and felons" from possessing firearms); *Heller*, 128 S. Ct. at 2795 n.10 (noting that in eighteenth-century Scotland, certain persons "convicted before [a] justice of peace" would "for the first offense forfeit all * * * arms" (quotation omitted)). The Second Amendment codified that understanding. *See Heller*, 128 S. Ct. at 2804 (the Amendment "was widely understood to codify [the] pre-existing right, rather than to fashion a new one"). Indeed, violent criminals' forfeiture of arms furthered the Second Amendment's stated purpose: maintaining "the security of a free State," or, put another way, the safety of society at large. 10 U.S. CONST. amend. II; *see Heller*, 128 S. Ct. at 2800 ("'security of a free [S]tate' meant 'security of a free polity,' not security of each of the several States"). As the Supreme Court pointed out in *Heller*, "[m]any colonial statutes required individual arms-bearing for public safety reasons." 128 S. Ct. at 2802. One example the Court mentioned was a 1770 Georgia law requiring arms-bearing "'for the security and defence of th[e] province from internal dangers and insurrections.'" *Ibid*.

4

(emphasis omitted). Such statutes reflected the then prevailing belief, noted by various commentators, that the right to bear arms was "inextricably * * * tied to" the concept of a "virtuous citizen[ry]" who would protect society through "defensive use of arms against *criminals*, oppressive officials, and foreign enemies alike." Don B. Kates, *The Second Amendment: A Dialogue*, 49 LAW & CONTEMP. PROBS. 143, 146 (1986) (emphasis added); *cf.* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995) (noting that felons "were excluded from the right to arms" because they were "deemed incapable of virtue" (quotation omitted)).

Extending the right to bear arms to violent criminals, including convicted violent felons like Defendant, would undermine this model by making it more difficult for law-abiding citizens to protect themselves. It cannot be thought that the practical-minded Framers, in codifying a right that was understood to exist primarily for the sake of self-defense (*see Heller*, 128 S. Ct. at 2796, 2801, 2803-2805, 2807, 2809, 2811, 2817-2818), would have simultaneously thwarted that purpose by bestowing the right — *sub silentio* and for the first time in history — on the most dangerous members of society. *Cf. Terminiello* v. *City of Chicago*, 337 11 U.S. 1, 37 (1949) (Jackson, J., dissenting) (counseling the use of "practical wisdom" in constitutional interpretation, lest the Bill of Rights be "convert[ed] * * * into a suicide pact"). Cesare Beccaria, a contemporary of and major influence on the Framers, cautioned against any system under which violent criminals would be armed but law-abiding citizens would not be. Randy E. Barnett & Don

B. Kates, *Under Fire: The New Consensus on the Second Amendment*, 45 EMORY L.J. 1139, 1215 & n.356 (1996) (citing CESARE BECCARIA, AN ESSAY ON CRIMES AND PUNISHMENTS 87-88 (1764)). Similarly, William Rawle — an early constitutional scholar on whose works the Supreme Court heavily relied in *Heller* (128 S. Ct. at 2798, 2800, 2805-2806, 2816) — observed that, because the individual right to bear arms "'ought not * * * in any government * * * be abused to the disturbance of the public peace,'" a person bearing arms under "'circumstances giving just reason to fear that he purposes to make an unlawful use of them'" could be subject to regulation. Dowlut, *supra*, at 85 (quoting WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 126 (1825)); *cf. Heller*, 128 S. Ct. at 2803 (quoting an 1825 decision of the Massachusetts Supreme Judicial Court, *Commonwealth* v. *Blanding*, 20 Mass. 304, 313-314 (1825), for the proposition that "'the right to keep fire arms * * * does not protect him who uses them for annoyance or destruction'"). The obvious implication was that, because the state could reasonably fear that a person who had used unlawful violence in the past would be likely to use firearms in a dangerous or threatening manner, violent criminals were subject to regulation even under the Second Amendment.

In light of this history it is hardly surprising that, before this case, every court that has considered a Second Amendment challenge to Section 922(g)(1) has rejected it. *United States* v. *Marzzarella*, 595 F. Supp. 2d 596, 598-599 (W.D. Pa. 2009) (after *Heller*, "it appears that every court which has considered a Second Amendment challenge to" "any *

* * subsection of § 922" "has upheld the statute as constitutional" (citing cases)).

II.  **The court should reject – as *Heller* expressly rejects – Defendant's argument that he has a right to constructively possess firearms within his home not withstanding his status as a convicted felon.**

Defendant argues that, even though he is a felon, he nevertheless has a Second Amendment right to possess a firearm in his home. That argument has no merit.

The plaintiff in *Heller* was not a felon. He was a special police officer in the District of Columbia, who applied to register a handgun that he wished to keep in his home. *Heller*, 128 S. Ct. at 2788. In finding that the plaintiff had a Second Amendment right to possess an operable handgun in his home for self-defense, the Supreme Court emphasized: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 2816-17 (emphasis added). This express limitation on *Heller*'s holding, as it applies to a felon, puts an end to the question of whether *Heller* can be used to argue for a Second Amendment right for a felon to possess firearms.

The Supreme Court previously upheld the predecessor felon-in-possession statute in *Lewis v. United States*, 445 U.S. 55 (1980) (upholding validity of 18 U.S.C. App. § 1201(a)(1) (repealed; similar provision codified at 18 U.S.C. 922(g))). Upholding a conviction for receipt of a firearm by a felon, the Supreme Court said in *Lewis*: "These

7

legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they entrench upon any constitutionally protected liberties. *See United States v. Miller*, 307 U.S. 174, 178(1939) (the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia')." *Lewis*, 445 U.S. at 65 n.8. The Court in *Heller* discussed this section of *Lewis* because the District of Columbia invoked it as rejecting an individual right to bear arms. The *Heller* Court noted that the passage could not bear that much weight. *See Heller*, 128 S. Ct. at 2816 n.25. But given the *Heller* Court's limitation of its holding with respect to felon-in-possession, the narrow holding of *Lewis* – that felons have no Second Amendment right to possess firearms – remains good law.

Given *Heller*'s emphasis upon the original meaning of the Second Amendment, felons have no better Second Amendment argument after *Heller* than they did before, and that would be the case even if *Heller* had not expressly noted that felons can be prohibited from possessing firearms. As explained in Donald B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983), the constitutionality of prohibiting felons from possessing firearms "cannot seriously be questioned on a theory that felons are included within 'the people' whose right to arms is guaranteed by the second amendment." Explaining further:

> Felons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods,

8

>usually accompanied by death. . . . Nor does it seem that the Founders considered felons within the common law right to arms or intended to confer any such right upon them. All the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent.

*Id. See also* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms].").

Courts of appeals recognizing an individual right to bear arms before *Heller* easily rejected possession by felons. *See Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007) (noting that laws prohibiting felons from possessing arms "promote the government's interest in public safety consistent with our common law tradition. Just as importantly, however, they do not impair the core conduct upon which the right was premised."); *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001) ("[I]t is clear that felons . . . may be prohibited from possessing firearms[.]"). *See also United States v. Gilbert*, 2008 WL 2740453, at *2 (9th Cir., July 15, 2008) (unpublished) ("Under *Heller*, individuals still do not have the right to possess machineguns or short-barreled rifles, as Gilbert did, and convicted felons, such as Gilbert, do not have the right to possess any firearms.").

The right to keep and bear arms is one of several rights that have historically been forfeited by felons, and the constitutionality of that forfeiture is settled. For example,

felons have long been denied the right to vote. The constitutionality of that loss of rights is expressly recognized in section 2 of the Fourteenth Amendment, and the Supreme Court explained and upheld such forfeiture in *Richardson v. Ramirez*, 418 U.S. 24 (1974). Felons are typically also prohibited from jury service – *see*, *e.g.*, 28 U.S.C. § 1865(b)(5) – which has been upheld.[1] The right to keep and bear arms is a civic right and commission of a felony is a proper basis for curtailing certain civic rights and obligations that apply to law-abiding citizens. That remains true even when the civic right is grounded in the Constitution.

In sum, the Court's opinion in *Heller* is clear: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." *Heller*, 128 S. Ct. at 2816-17. And since *Heller*, reviewing courts, including the 10th Circuit, have easily rejected any assertion that felons have a Second Amendment right to possess firearms. *See United States v. Gilbert*, 2008 WL 2740453, at *2 (9th Cir., July 15, 2008) ("Under *Heller*, individuals still do not have the right to possess machineguns or short-barreled rifles, as Gilbert did, and convicted felons, such as Gilbert, do not have the right to possess any firearms.") and *U.S. v. McCane*, --- F.3d ----, 2009 WL 2231658 (10th Cir., July 28, 2009).

**III.    The court should reject Defendant's argument that his spouse's Second Amendment right to have a firearm trumps his restricted status as a violent**

---

[1] *See*, *e.g.*, *United States v. Barry*, 71 F.3d 1269, 1273-74 (7th Cir. 1995); *United States v. Arce*, 997 F.2d 1123, 1127 (5th Cir. 1993); *United States v. Greene*, 995 F.2d 793, 798 (8th Cir. 1993); *United States v. Foxworth*, 599 F.2d 1, 4 (1st Cir. 1979).

**felon.**

Defendant asks this Court to rule that he has a constitutional right to constructively possess firearms within his home despite his violent felony convictions – notwithstanding the fact that it was within his home that he committed the violent acts of child abuse for which he was convicted. There is no basis in law, or reason, for such a ruling.

To begin, it is not uncommon for criminal penalties to create potential friction, inconvenience, or conflict between husband and wife. Such a result does not invalidate or relax lawful restrictions resulting from a criminal conviction. For example, under Utah law certain convicted sex offenders are prohibited from coming within 1,000 feet of a preschool, licensed daycare, school, public pool, community park or playground. *See* Utah Criminal Code § 77-27-21.7. This restriction may cause some inconvenience between spouses, especially where the unrestricted spouse enjoys spending time at a local park or community pool and the restricted party finds himself unable to accompany her. Moreover, certain convicted sex offenders may have to move from there their residence if the home is within 1,000 feet of a protected area. These restrictions are lawful and appropriate in order to protect society from sexual predators.

Similarly, a probationer or parolee who is restricted from leaving the state may find himself unable to visit family members or vacation outside of his home state – this despite the fact that the United States Constitution protects the right to travel among states under the "privileges and immunities" cause in Article IV, Section 2 and by the 14th

Amendment's "citizenship clause." While such a limitation has potential to cause marital discord, it does not invalidate the probationers restriction.

In a similar vein, a DUI defendant who is court ordered to install an ignition interlock device[2] on his motor vehicle cannot ignore the court's order simply because he shares the vehicle with his spouse. Society recognizes that the public safety interest in keeping alcoholics from driving while intoxicated supercedes societies interest in avoiding marital inconvenience.

Defendant seems to suggest that, as a convicted felon, his right to be married is diametrically opposed to his spouses right to possess a firearm and that his restricted status must therefore be relaxed sufficiently to allow him to constructively possess firearms. The premise of his argument is erroneous. Defendant misinterprets Title 18 United State Code Section 922(g)(1) . Federal law does not prohibit a felon from living in a home where firearms are present, rather, federal law prohibits a felon from actually or constructively possessing any firearm in or affecting commerce. *See* 18 U.S.C. § 922(g). A person constructively possesses an item when a person knowingly has the power and intention at a given time to exercise dominion and control over the object, either directly or through others, or has dominion over the premises where the object is found. *United States v.*

---

[2] An "ignition interlock device" or "breath alcohol ignition interlock device" is a mechanism, like a breathalyzer, installed on a motor vehicle. Before the vehicle's motor can be started, the driver first must exhale into the device, if the resultant breath-alcohol concentration is greater than the programed blood alcohol concentration the motor will not turn over.

*Mills*, 29 F.3d 545, 549 (10th Cir. 1994). In other words, Defendant cannot live in a home where he has access, dominion, and control over a firearm. Defendant's novel, but ill conceived, argument that Section 922(g)(1) denies him the right to be married to his gun-owning wife is misplaced. This is not a situation where Ms. Bay maintained a firearm in a gun safe inaccessible to Defendant. This is not even a case of joint constructive possession. Rather, this is a case where Defendant, unbeknownst to his spouse, possessed her handgun in a storage shed adjacent to the marital home. Defendant had *sole* possession of the firearm. Mrs. Bay wasn't even aware that the gun was at the marital home, in fact, she believed the gun was at a family cabin.

## **CONCLUSION**

Like other constitutional rights, the individual right protected by the Second Amendment is not absolute, but is subject to appropriate restrictions. Based on the foregoing, Defendant's Motion to Dismiss Indictment should be denied.

Respectfully submitted this 27th day of August, 2009.

                                          BRETT L. TOLMAN
                                          United States Attorney


                                           /s/ J. Drew Yeates
                                          J. DREW YEATES
                                          Assistant United States Attorney

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of the United States Attorney's Office, and that a copy of the foregoing **UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT** was provided electronically and mailed, postage prepaid, to all parties named below, this 27th day of August, 2009.

    Kelly Ann Booth
    331 South Rio Grande, Suite 302
    Salt Lake City, UT 84101

    /s/ JCW
    Legal Assistant